145 N.J. Super. 167 (1976)
366 A.2d 1375
STATE OF NEW JERSEY IN THE INTEREST OF R.G.W.
Superior Court of New Jersey, Juvenile and Domestic Relations Court, Passaic County.
October 20, 1976.
*171 Mr. Salim J. Balady, Assistant Deputy Public Defender, Passaic County, for petitioner (Mr. Terence P. Corcoran, Deputy Public Defender, Passaic County, attorney; Mr. Balady of counsel and on the brief).
Mr. Mark A. Geannette, Deputy Attorney General, for respondent New Jersey Commissioner of Institutions and Agencies (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. Geannette of counsel and on the brief).
Mr. Carl Hecht, Assistant Prosecutor, Passaic County, for respondent State of New Jersey (Mr. Burrell Ives Humphreys, Prosecutor, Passaic County, attorney).
*172 Mr. Herman Osofsky, Assistant Passaic County Counsel, for respondent Passaic County Board of Chosen Freeholders (Martin Verp, Passaic County Counsel, attorney).
NITTO, J.C.C., Temporarily Assigned.
Petitioner seeks a court order implementing his constitutional and statutory right to effective medical and psychiatric treatment or, in the alternative, directing his immediate release.
Petitioner was originally institutionalized at Greystone Park Psychiatric Hospital, Morristown, New Jersey, by order of the Passaic County Juvenile and Domestic Relations Court, dated February 25, 1974, upon a finding by this court that he suffered from a mental condition rendering him incompetent to stand trial upon a complaint alleging murder in the first degree. The date of the offense charged was August 24, 1973, some three days before petitioner's sixteenth birthday.
Institutionalization of petitioner upon this finding and subsequent orders of the court has continued to date, uninterrupted, for a period in excess of 2 1/2 years.
Notwithstanding the findings of the court, reflected in its order of February 25, 1974, Greystone Park Psychiatric Hospital authorities failed to treat the condition found to exist by the court, asserting that such mental condition, in fact, did not exist. The determination of the hospital authorities was made known to the court by letter, dated April 3, 1974.
This assertion precipitated a rehearing on the question of petitioner's competence by the court on May 10, 1974.
Following testimony by the State, defense, and the hospital authorities, the court, by order of May 10, 1974, affirmed its original conclusions  finding that the contention of the Greystone Park authorities, to the effect that petitioner required no further treatment and that no psychosis existed, to be totally without merit  and remanded petitioner to Greystone Park where he remained, ostensibly untreated for the condition found to exist by the court, until June 25, 1976.
*173 On June 25, 1976, following plenary hearing on the complaint as directed by the New Jersey Supreme Court in State in the Interest of R.G.W., 70 N.J. 185 (1976), the court determined, among other things, that petitioner remained incapable of comprehending his position, consulting with counsel or cooperating in his defense, and therefore was not competent to stand trial. The court further determined that petitioner, at the time and place alleged in the complaint was psychotic and laboring under such defect of reason as to be incapable of distinguishing right from wrong or comprehending the nature and quality of his acts, and that such condition persisted at the time of the June 25, 1976 hearing, with the result that petitioner was rendered a danger to himself and to the community.
By order dated June 29, 1976 the court entered a judgment of acquittal on the complaint alleging murder in favor of petitioner by reason of his insanity at the time of the offense alleged, and ordered his continued institutionalization at Greystone Park Psychiatric Hospital until further order of the court.
During the June 25, 1976 hearing the court permitted expert testimony assessing implementation of petitioner's right to treatment for the condition found to exist by the court on February 25, 1974, May 10, 1974 and June 25, 1976.
Testimony in this respect was furnished by psychiatrists Dr. J. Lloyd Morrow, and Dr. Samuel I. Kesselman, who, testifying for petitioner and the State on the three occasions to which reference has been made, furnished the medical and psychiatric evidence upon which the court based its judgments.
Both psychiatrists concurred that petitioner had received no meaningful treatment for his condition at the Greystone Park facility from the time of his original commitment, February 25, 1974, principally for the reason that the medical authorities there refused to recognize the existence of the mental infirmity diagnosed by them and found to exist by the court.
*174 The psychiatrists further concurred that, assuming recognition of petitioner's mental infirmity, appropriate treatment for his condition was not available at any state institution or any private institution within the State of New Jersey. With due consideration for the security aspects necessarily attendant to petitioner's institutionalization, the Menninger Clinic, Topeka, Kansas, was recommended as a suitable place of treatment.
Petitioner requested a court order implementing his right to treatment following the testimony of Dr. Morrow and Dr. Kesselman. The court adjourned hearing on the application pending the joining in the action of the New Jersey Commissioner of Institutions and Agencies and the Passaic County Board of Chosen Freeholders, in addition to the Passaic County Prosecutor.
On October 8, 1976, the necessary parties having been joined as directed by the court, plenary hearing on petitioner's application was held.
Dr. Morrow, testifying in behalf of petitioner, confirmed his previous diagnoses of petitioner's condition, noting that the underlying psychosis which rendered petitioner dangerous to himself and to others had not abated since his original commitment in February 1974. He equated the Greystone Park Psychiatric Hospital facility to a "warehouse" for the mentally infirm and asserted that, for all the validity of the mode of treatment being furnished petitioner, he would be equally well-served by confinement at a penal institution. He added that petitioner's condition would likely "harden" and become exceedingly difficult to treat in the near future if definitive psychiatric treatment were not immediately undertaken.
Dr. Morrow restated his position  first expressed at the hearing of June 25, 1976  that, at the very least, treatment appropriate to petitioner's condition required that he have a personal relationship, on a one-to-one basis, with a psychiatrist or qualified psychotherapist; a meaningful program of social developmental activity, and a meaningful program of education consistent with his intellectual ability.
*175 Dr. Kesselman, testifying in behalf of the State of New Jersey at the request of the Passaic County Prosecutor, also confirmed his previous diagnoses of petitioner's condition, noting no material change in the underlying psychosis. He characterized petitioner as a severe assaultive risk at the present time, with potential for dangerousness to himself in circumstances where the assaultive tendencies were frustrated. He concurred in Dr. Morrow's view that, absent implementation of one-to-one psychotherapy in connection with other rehabilitative treatment, petitioner's condition would "harden" and resist any means of neutralization.
Dr. Kesselman testified that "one to one" psychotherapy was not a realistic expectation at Greystone Park Psychiatric Hospital, notwithstanding its indispensability to a particular case, for the reason that patient population substantially overbears staff resources to accomplish such treatment.
The indispensability of one-to-one psychotherapy in the treatment of psychosis such as that suffered by petitioner was the consequence, it was noted, of the fact that the rapport developed between patient and therapist formed the basis of the patient's motivation to participate in supplemental treatment such as group therapy and vocational or educational training. Dr. Kesselman asserted that without such motivation on the part of the patient, his psychosis would never be abated by other than medical accident. He cited an example from his professional experience in which the mode of treatment for petitioner recommended by Dr. Morrow, and in which he concurred, precipitated impressive, affirmative results.
Review by the court of petitioner's clinical history at Greystone Park Psychiatric Hospital did not disclose his ever having been provided purposeful psychotherapy. There is no evidence of record which indicates that petitioner was ever afforded educational training of consequence during his long confinement at that facility. The record does reflect that attempts in this connection were undertaken. Reasonable *176 justification for their abandonment far short of accomplishment of specific goals is not apparent.
Dr. Kesselman observed that group therapy in which petitioner is presently involved is producing insight, evidencing the present amenability of his condition to treatment, though it remains, in its latent state, substantially unneutralized.
He noted, however, in his formal report on petitioner's condition  admitted into evidence before this court without objection, the following: "The therapy he is receiving is standardized, but lacking in quality and intensity. * * * Prognosis for improvement to the extent where he will be ready for release without presenting a threat to society is unfavorable at present."
Dr. Kesselman indicated that the motivation which now impels petitioner to participate in group therapy may well be the result of his merely having grown older and matured, rather than the product of medical design. The court's study of petitioner's clinical history tends to support the former alternative.
Dr. Ildefonso Esteban, testifying at the request of the Attorney General of New Jersey in behalf of Greystone Park Psychiatric Hospital and the New Jersey Commissioner of Institutions and Agencies, indicated that he was one of several psychiatrists responsible for petitioner's case during his confinement at Greystone Park. Dr. Esteban indicated that he personally has not counselled with petitioner since about mid-year of 1975, but testified he is familiar with the case as a result of being Assistant Medical Director of the Greystone Park facility. Based on his connection with the case, Dr. Esteban denied that petitioner is presently suffering from schizophrenia, as indicated by Dr. Morrow and Dr. Kesselman. He further denied that petitioner ever suffered from such mental infirmity, but asserted that petitioner was merely suffering from a behavior disorder not uncommon among adolescents.
Dr. Esteban indicated that, absent consideration of the criminal act attributed to petitioner, and of which he was *177 acquitted by reason of insanity, petitioner would not be regarded as dangerous by the Greystone Park medical authorities. He asserted that the group therapy in which petitioner is engaged is sufficient to rectify his condition as defined by the Greystone Park medical staff, and that the temporary release of petitioner to attend various occupational and educational therapy programs in the community, accompanied only by a hospital attendant, would constitute neither danger to the public nor exacerbate the danger he might pose to himself.
Dr. Esteban acknowledged that petitioner never received treatment appropriate to schizophrenia by reason of the Greystone Park Psychiatric Hospital medical staff having determined that such condition did not exist.
Dr. Esteban's testimony was similar in all material respects to that which he furnished to the court at the hearing of May 10, 1974, at which he testified in support of the position taken by the Greystone Park Psychiatric Hospital authorities with respect to petitioner's condition at that time.
Consequent to the development of this sharply drawn dichotomy in the evidence presented, the court noted that Dr. Morrow and Dr. Kesselman are diplomates in psychiatry of the Board of Neurology and Psychiatry. Dr. Esteban is not similarly qualified.
Upon inquiry into matters ancillary to the court's disposition of petitioner's application, the court determined that petitioner, though before the Juvenile Court, is 19 years of age and is indigent according to the standards set forth in N.J.S.A. 2A:158-14 entitling him to Public Defender representation.
This case is one of first impression in the State of New Jersey. While there are recorded cases in which the right to treatment has been enforced by the courts for persons involuntarily committed to state institutions as a result of conviction of crime, or against whom a juvenile delinquency claim has been sustained, there are no recorded cases in which the courts have been called upon to enforce this right *178 in behalf of an individual involuntarily committed to a state institution as a result of his having been acquitted of crime by reason of insanity and the condition having been found to persist, rendering the defendant dangerous to himself and society.
The application for implementation of petitioner's right to treatment is properly before the Passaic County Juvenile and Domestic Relations Court, notwithstanding the fact that petitioner is no longer a juvenile, by reason of our Supreme Court having decided that such applications must be addressed to the court which ordered the original commitment. State v. Carter, 64 N.J. 382 (1974). In this way, the application can be considered by the court most familiar with the record, and the prosecutor who represented the State at the time of commitment will be in a position to be heard. Administrative Office of the Courts, Memorandum re: "Transfer of Defendants Committed to the New Jersey State Hospital After a Finding of Insanity at the Time of the Offense," dated October 10, 1974.
Petitioner, having been committed by the Passaic County Juvenile and Domestic Relations Court pursuant to authority conferred by N.J.S.A. 2A:163-2, State in the Interest of R.G.W., 135 N.J. Super. 125 (App. Div. 1975), aff'd 70 N.J. 185 (1976), and State v. Krol, 68 N.J. 236 (1975), properly applies to this Court for a modification of his circumstances notwithstanding the fact that he is no longer a juvenile. This principle is reinforced by longstanding statutory and case law and the rules of court. N.J.S.A. 2A:4-52; In re Smigelski, 30 N.J. 513, 521-523 (1959); R. 5:9-10 (d) and (e).
The right to treatment is, in the State of New Jersey, a statutory right, inextricably woven into the fabric of rights of constitutional magnitude, which state of the law is recognized and codified in N.J.S.A. 30:4-24.1 explicitly conferring fundamental civil rights and the right to medical care and other professional services upon the mentally ill.
N.J.S.A. 30:4-24.1 provides:
*179 Every individual who is mentally ill shall be entitled to fundamental civil rights and to medical care and other professional services in accordance with accepted standards, provided however that this shall not be construed to require capital construction. Every individual between the ages of 5 and 20 years shall be entitled to education and training suited to his age and attainments. Every patient shall have the right to participate in planning for his own treatment to the extent that his condition permits.
It is manifest from the wording of the statute that the Legislature recognized the constitutional magnitude of the rights to which the right to treatment is inseparably bound, and anticipated implementation of the panoply of these rights by the agencies directly charged with their implementation and by the courts. This view is amply confirmed by the Legislature's enactment of N.J.S.A. 30:4-24.2, commonly known as the Mental Patients' Bill of Rights.
The right to treatment is an affirmative obligation on behalf of the State. State v. Carter, 64 N.J. 382, 393-394 (1974), citing with approval the following from In re D.D., 118 N.J. Super. 1, 6 (App. Div. 1971):
It is beyond question that a person committed to a state hospital for the mentally afflicted has a right to receive treatment in an effort to cure or improve his or her condition. It is a notorious fact that over-crowding and understaffing in our public mental institutions result in inadequate treatment for the average patient. But recognition must be given to a patient's right to treatment. It is not enough to confine the patient, to afford only minimal custodial care, to institutionalize him or her in a mental prison. * * * [It is recognized] that the Legislature is better equipped to create specific procedures and establish the necessary institutions to insure a mental patient's right to treatment than are the courts. However, in the absence of any legislative implementation, the court must function to protect the rights of persons committed to our public mental institutions. The court may insure that the administrators have performed their task with care and reached a reasonable result. [Emphasis supplied]
Failure to implement the right to treatment is conduct in derogation of the prohibition against cruel and unusual punishment expressed in the Eighth Amendment to the *180 United States Constitution, and in violation of the equal protection and due process of law requirements of the Fourteenth Amendment to the United States Constitution.
A State may not constitutionally impose criminal sanctions against persons who have committed no crime. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758.
The effect of a determination of insanity or a successful plea of insanity under N.J.S.A. 2A:163-2 or 2A:163-3 is that no indictable "crime" was committed. The offender is not a criminal, but an individual requiring medical attention. There has been no criminal act to punish. The stigma of criminal is not imposed upon the mentally ill. See State v. Maik, 60 N.J. 203, 213 (1972). "If the defendant was insane when the alleged crimes were committed, he is just as innocent legally as if they were perpetrated by some other person." State v. Stern, 40 N.J. Super. 291, 296 (App. Div. 1956). There is no criminal to incarcerate. There is, however, a patient to be treated. See Hough v. United States, 106 U.S. App. D.C. 192, 271 F.2d 458 (D.C. Cir.1959).
When patients are committed for treatment purposes they unquestionably have a constitutionally reinforced right to receive such individual treatment as will give each of them a realistic opportunity to be cured or to improve his or her mental condition. Rouse v. Cameron, 125 U.S. App. D.C. 366, 373 F. 2d 451 (D.C. Cir.1966); In re D.D., supra; State v. Carter, supra.
Adequate and effective treatment is constitutionally required because, absent effective treatment, the hospital is transformed "into a penitentiary where one could be held indefinitely for no convicted offense." Ragsdale v. Overholser, 108 U.S. App. D.C. 308, 281 F.2d 943, 950 (D.C. Cir.1960).
The purpose of involuntary hospitalization for treatment purposes is treatment and not mere custodial care or punishment. Wyatt v. Stickney, 325 F. Supp. 781, 784 *181 (M.D. Ala. 1971), aff'd sub nom. Wyatt v. Aderholt, 503 F.2d 1305 (5 Cir.1974); In re D.D., supra, 118 N.J. Super. at 6; State v. Carter, supra, 64 N.J. at 393-394.
The failure to provide suitable and adequate treatment to the mentally ill cannot be justified by lack of staff or facilities. In the opinion of the American Psychiatric Association, no tax-supported hospital in the United States can be considered adequately staffed. The situation cannot be remedied immediately, but indefinite delay cannot be approved. The right to treatment is a present right and is to be promptly fulfilled. Watson v. City of Memphis, 373 U.S. 526, 533, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963) (emphasis supplied).
The labels "criminal commitment" and "civil commitment" are of no constitutional significance. The fact that the person committed has previously engaged in criminal acts is not a constitutionally acceptable basis for imposing upon him a substantially different standard or procedure for involuntary commitment. Baxstrom v. Herold, 383 U.S.. 107, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1966); Jackson v. Indiana, 406 U.S. 715 (1972); [State v. Krol, 68 N.J. 236, 250-251.]
Pursuant to N.J.S.A. 30:4-91.2, the New Jersey Commissioner of Institutions and Agencies may designate as a place of confinement any available, suitable and appropriate institution or facility, whether owned by the State or otherwise, and may at any time transfer a person from one place of confinement to another. While this statute is cast in terms of persons convicted of crime, it is clear that its provisions pertain to any person involuntarily committed to an institution by the State. A contrary interpretation would read into the statute the constitutional infirmity of denial of equal protection of the law in that greater rights would be conferred upon those persons committed by the State by reason of conviction of crime than upon those persons committed by the State who are innocent of crime.
*182 Courts are constrained by a vast body of law to interpret statutes in a manner which renders their application constitutionally sound.
The spirit of legislative direction prevails over its general terms. Dvorkin v. Dover Twp., 29 N.J. 303, 315 (1959). The fundamental purpose for which the legislation was enacted controls. New Jersey Builders, etc. Ass'n v. Blair, 60 N.J. 330, 338 (1972). It is not the words but the "internal sense of the act that controls." San-Lan Builders, Inc. v. Baxendale, 28 N.J. 148, 155 (1958). See also, Asbury Park Bd. of Ed. v. Hoek, 38 N.J. 213, 231 (1962).
"[The] will of the law-giver is to be gathered from the object and nature of the subject matter, the contextual setting, and the mischief felt and the remedy in view ... [and the] particular terms are to be made responsive to the essential principle of the law. San-Lan Builders, Inc. v. Baxendale, 28 N.J. [148 at 155 (1958)]." "`Where a literal rendering will lead to a result not in accord with the essential purpose and design of the act, the spirit of the law will control the letter.' New Jersey Builders, Owners and Managers Ass'n v. Blair, supra, 60 N.J. [330] at 338 (1972). Reason is the soul of law. Wright v. Vogt, 7 N.J. 1 (1951). [State v. Carter, supra, 64 N.J. at 390-391]
In enacting N.J.S.A. 30:4-91.2 the Legislature intended that the Commissioner of Institutions and Agencies be empowered to accommodate those persons for whom she had responsibility in a manner which best served the interests of those persons and the interests of the public. It is inescapable that petitioner is one of the persons for whom the Commissioner has responsibility, it naturally follows that the statute inures to his protection.
The court, by virtue of its parens patriae jurisdiction, has a right and duty to protect the public interest and to protect such persons with disabilities who have no rightful protector. Parens patriae jurisdiction is an inherent right of sovereignty and imposes a duty on the sovereignty to protect such persons with disabilities, such as mental infirmity, who have no rightful protector. Johnson v. State, *183 18 N.J. 422, 430 (1955). It is manifest that the scope of this right and duty encompasses the enforcement of constitutional and statutory rights of persons mentally afflicted and under the protection of the court, subject to concommitant concern for the public safety. In re D.D., supra, 118 N.J. Super. at 6; State v. Carter, supra, 64 N.J. at 401.
In this connection the court has broad power to compel governmental agencies to allocate funds so as to enforce constitutional rights. Griffin v. School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Robinson v. Cahill, 62 N.J. 473 (1973).
The court, having examined the state of the law as it bears upon the application of the petitioner in this matter; having studied the transcripts of proceedings held in connection with this same general matter on February 25, 1974; May 10, 1974 and June 25, 1976, during which proceedings the State of New Jersey was represented by the Passaic County Prosecutor; having studied the complete institutional history of petitioner at Greystone Park Psychiatric Hospital from February 25, 1974 to this date; having studied the legal authorities submitted for consideration in connection with petitioner's present application; and having heard and considered the testimony adduced at the plenary hearing on that application and the recommendations of counsel on behalf of all parties concerned as to appropriate disposition of this matter, is compelled to findings of law and fact as follows:
(a) This court finds, as a matter of fact, that the Passaic County Juvenile and Domestic Relations Court is the court responsible for the original and continuing commitment of the petitioner.
(b) This court finds, as a matter of law, that petitioner is properly before the Court upon an application for a court order implementing his right to treatment or, in the alternative, directing his immediate release.
(c) This court finds, as a matter of law, that the right to treatment in the State of New Jersey is a statutory right *184 which is inseparably bound to and reinforced by fundamental civil rights of constitutional magnitude, specifically, due process of law, equal protection of the law and the prohibition against cruel and unusual punishment, which state of the law is explicitly recognized by the New Jersey State Legislature and codified by it in N.J.S.A. 30:4-24.1.
(d) This court finds, as a matter of law, that implementation of the right to treatment is an affirmative obligation on behalf of the State.
(e) This court finds, as a matter of law, that failure of the State to implement the right to treatment is conduct in derogation of the prohibition against cruel and unusual punishment expressed in the Eighth Amendment to the United States Constitution and in violation of the due process and equal protection of the law requirements of the Fourteenth Amendment to the United States Constitution.
(f) This court finds, as a matter of law, that the mode of commitment of a person adjudged mentally ill, whether "civil" or "criminal," is not a constitutionally viable distinction upon which to base the mode of treatment appropriate to the case.
(g) This court finds, as a matter of law, that the New Jersey Commissioner of Institutions and Agencies is preeminently responsible for the welfare of any person involuntarily committed by the State of New Jersey pursuant to valid state interest and has a right, in connection with such responsibility, to place any such person in any available, suitable and appropriate institution or facility, whether owned by the State or otherwise, and may at any time transfer a person from one place of institutionalization to another in furtherance of his interests as well as the interests of the public.
(h) This court finds, as a matter of law, that, in the absence of legislative or agency implementation of the right to treatment, the courts have an absolute, immediate right and duty to implement such right, which right and duty encompass the power to issue specific implementation orders *185 to responsible agencies and to direct allocation of funds to insure that such implementation orders are given immediate full force and effect.
(i) This Court finds, as a matter of fact, that petitioner is at this time perniciously mentally ill  legally and medically insane; this condition has persisted, substantially unchanged, since the date of his original commitment to Greystone Park Psychiatric Hospital by order of this court on February 25, 1974, to the present time. This condition renders petitioner dangerous to himself and to others; he is not, at this time, fit for conditional release.
(j) This Court finds, as a matter of fact, that treatment appropriate to petitioner's condition includes, but is not limited to, a personal relationship  on a one-to-one basis  with a psychiatrist or qualified psychotherapist; a meaningful program of social developmental activity and a meaningful program of education consistent with his intellectual ability.
(k) This court finds, as a matter of fact, that the condition from which petitioner suffers is, given appropriate treatment, susceptible to significant improvement or neutralization.
(l) This court finds, as a matter of fact, that petitioner, from the date of his original commitment to Greystone Park Psychiatric Hospital by order of this court on February 25, 1974, has not received treatment appropriate to his condition as required by law in that he has not been provided with a meaningful program of psychotherapy, a meaningful program of social developmental activity, or a meaningful program of education training consistent with his abilities.
(m) This court finds, as a matter of fact, that the failure to implement petitioner's right to treatment is based on two premises: (1) lack of qualified staff at the facility in which he is confined, to carry out the treatment required, and (2) persistent refusal of such medical authorities as may be employed at Greystone Park Psychiatric Hospital to recognize the ramifications and seriousness of the mental condition from *186 which petitioner is suffering, notwithstanding findings of the existence, seriousness and extent of such illness made by this court, aided in reaching its conclusion by a total of not less than three psychiatric experts, all of whom were diplomates in psychiatry of the Board of Neurology and Psychiatry, testifying on behalf of the State and petitioner on three separate occasions prior to the present hearing  and at all times in between, unabated to the present.
(n) This court finds, as a matter of fact, that, for all legal purposes, petitioner is indigent.
Based on these findings, petitioner's application for court order implementing his right to treatment is granted.
Accordingly, it is on this 20th day of October, 1976,
ORDERED that the New Jersey State Commissioner of Institutions and Agencies undertake such inquiry and expend such funds as are necessary to effect the placement and maintenance of the petitioner at an institution, whether public or private, whether within the State of New Jersey or elsewhere, subject to the Court's approval, at which implementation of his right to treatment as required by law and defined by this Court will be achieved.
ORDERED that the commissioner shall report the details and results of such effort to this court within 30 days.
This court will retain jurisdiction in this matter.